JENKINS v. STATE.

(*Knoxville.*   October 16, 1897.)

1. CRIMINAL PRACTICE.  *Wrongful discharge of juror not reversible error, when.*

   If the defendant in a criminal case obtains a satisfactory jury, without exhausting his peremptory challenges, the Court's error in discharging a competent juror, over defendant's objection, would not avail him for a reversal.  (*Post, pp. 573–577.*)

2. SAME.  *Discharge of "whitecap" from jury service proper, when.*

   The Court's discharge of an accepted juror, before the jury had been sworn, upon the charge that he was a "whitecap," is justified by proof of a general rumor that the juror was a "whitecap," which he did not offer to contradict or disprove. (*Post, p. 576.*)

3. CONSTITUTIONAL LAW.  *"Whitecap" statute constitutional.*

   That provision of Acts of 1897, Ch. 52, known as the "law against whitecaps," which disqualifies "whitecaps" to sit on grand or petit juries, and authorizes and requires the trial Judge to discover and rigidly exclude such outlaws from jury service, is constitutional and valid.  (*Post, pp. 573–576.*)

   Act construed:  Acts 1897, Ch. 25.

   Case cited: 114 U. S., 477.

FROM SEVIER.

Appeal in error from Circuit Court of Sevier County.   T. A. R. NELSON, J.

W. W. MULLENDORE for Jenkins.

Attorney-general PICKLE for State.

McALISTER, J. The plaintiff in error was convicted in the Circuit Court of Sevier County of the crime of robbery, and his term of imprisonment fixed by the jury at confinement in the State prison for the term of five years and six months. He has appealed in error.

The first assignment is that the conviction is not supported by the facts. The record discloses that on the night of November 7, 1896, the house of J. A. Burnett, in Sevier County, was entered by three masked men, and seventy-one dollars in money extorted from Mr. Burnett at the point of a pistol. The inmates of the house were aroused from sleep by a "lumbering noise" like violent kicks upon the door, and immediately three men, partially disguised, entered their sleeping apartment. They forced the daugher, a young lady about eighteen years of age, to get out of bed and light a lamp. One of the robbers held Mrs. Burnett down under the cover while the others forced Mr. Burnett into an adjoining room, where they supposed the money was concealed in a bureau drawer. The bureau, however, which one of the robbers expected to find in that room, had been removed, and search was then directed to the bedroom. Burnett told them to take him back into that room and his wife would tell them where the money was. In the meantime Burnett was knocked down and covered with pistols. Mrs. Burnett, at the request of her husband, finally produced the money and handed it to the robbers.

They then counted the money and soon took their departure. The clatter of horses' hoofs indicated that some of them went towards Sevierville and others in an opposite direction. There was testimony tending to show that while the crime was being perpetrated confederates of those in the house remained on the outside and went off with the robbers on horseback. The crime was committed about eleven o'clock, as indicated by the family timepiece, which was examined shortly after the robbers left.

There can be no doubt, in our opinion, that the defendant, Joe Jenkins, was one of the perpetrators of this crime. He is shown to have lived at one time within half a mile of the prosecutor, and was frequently at the latter's house. He had knowledge of the fact that the prosecutor was a government pensioner, and had just drawn his pension money. He had knowledge also that a bureau had been in the room across the hall, where the pension money was probably kept, and this fact accounts for the conduct of the robbers in immediately forcing Mr. Burnett into that room as soon as they entered the house. The bureau, however, had been removed from that room. It is further shown that while the robbers were in the house, the lamp was turned over, igniting the oil and causing a bright glare in the room. The mask of the defendant, Joe Jenkins, fell from his face, and he was distinctly recognized by Mr. and Mrs. Burnett, their daughter Maggie, and son Ollie, all of whom had known him well. These

witnesses all swear positively to his identity. John Christopher, who was jointly indicted with this defendant, but acquitted on this trial, testified that defendant, Joe Jenkins, admitted to witness, on Christmas day after the robbery, that he had gotten some of old man Burnett's money. Another witness stated that defendant requested him to have a five dollar bill changed, stating that as defendant had been arrested charged with this robbery, it might excite, suspicion if he had the bill changed.

Defendant undertook to overthrow all these incriminating facts and circumstances by the defense of an alibi. He testified that on the night of the robbery he was in Sevierville; that he remained at Baker's shop in said town until eight o'clock, when, in company with Pleas Wynn, George Thurmer, and Jep Jenkins, he went to a room in the storehouse of Yett & Trotter, where he engaged in playing cards until perhaps half past eleven o'clock; that he heard the clock strike twelve just after he got in bed; that he was not at the Burnett house that night, and had not been there for twelve months. Defendant introduces his card-playing companions as witnesses in support of the alibi. It is shown that Pleas Wynn, one of the alibi witnesses, is under indictment for complicity in this offense, and also for the murder of the Whaley family in Sevier County. George Thurmer, another witness for defendant, is also under indictment for this crime, and admits he has served a term in the penitentiary for murder.

Jep Jenkins, the remaining alibi witness, is also un-
der indictment for this robbery. Witness admits he
has been indicted for murder, and that two or three
cases are still pending against him. Moreover, cred-
ible witnesses, who were in the immediate vicinity
of the room where defendant claims the cards were
played, testified there was no light in the room on
that night. The jury were, of course, fully war-
ranted in discrediting the testimony of alibi witnesses.
It is unnecessary to refer to other incriminating
facts, as we have recited enough already to demon-
strate the guilt of the defendant.

Error is assigned upon the action of the trial
Judge in excluding one of the jurors. The record
shows that after the panel had been elected, but be-
fore they were sworn, the attention of the Court
was called to the fact that one of the jurors, J. L.
Romines, belonged to an unlawful organization known
as whitecaps, and was therefore incompetent as a ju-
ror. The Court thereupon proceeded to investigate
said charge, and, from the testimony of witnesses,
based on general rumor, became satisfied that said
juror was a member of said order, and thereupon
discharged the juror from said panel. Another juror
was then selected, and the panel was sworn. It ap-
pears that when the jury was thus completed, de-
fendant had not exhausted his peremptory challenges.
It is said that his Honor, in excluding the juror,
Romines, acted under authority conferred by Sec. 3,
Ch. 52, Acts 1897, entitled "An Act to prevent and

punish the formation or continuance of conspiracies and combinations for certain unlawful purposes,'' etc., 'commonly known as the law against whitecaps. Said section is as follows: '' That no person who has been guilty of any offense declared in the two preceding sections of this Act, shall be competent to sit or serve on any grand or traverse jury, and it shall be the duty of the Court to carefully exclude all such persons from the juries, both grand and petit; and when he shall be informed or shall have reason to suspect any person presented as a juror guilty of any of said offenses, he shall call witnesses, if necessary, and examine fully into the truth of the charge. He shall dismiss from the grand jury any person who has been selected, and afterwards shown to be implicated in any of said offenses.'' It is insisted that this Act is unconstitutional, but the provision of the organic law supposed to be violated is not pointed out. We think the Act simply adds another disqualification to jury service, and is in all respects valid.

In Tennessee, to be competent as a juror, (1) the person must be a man; (2) he must be a citizen; (3) he must be twenty-one years of age; (4) he must be a freeholder or householder; (5) he must be of sound mind; (6) he must be in full possession of the senses of hearing and seeing. The foregoing may be considered as the positive qualifications of a juror. The want of any one of them is cause for challenge. But although these qualifications exist, he

is yet incompetent, or subject to challenge for cause, if any of the following disqualifications exist: (1) If he is interested in the case in which he is presented as a juror; (2) if he has an adverse interest in a similar suit involving like questions of fact or with the same parties; (3) if · he is under conviction of a crime rendering him infamous; (4) if he has served as a juror within the two preceding years; (5) if he has a suit pending in the same Court; (6) if he is drunk when presented, or has been drunk during the term, or is an habitual drunkard; (7) if he is connected with either of the parties by affinity or consanguinity, within the sixth degree, computing by the civil law; (8) any person who has applied to the Sheriff to be one of the guard to take the prisoner to the penitentiary in event of conviction.

There are other causes of challenge, as that the juror has prejudged the case, or that he entertains such views about the case or the party as will prevent him from looking alone to the evidence for his verdict.     Caruthers' History of a Lawsuit, Sec. 202.

We think it was within the competency of the Legislature to further add to these statutory disqualifications, and exclude from jury service all persons shown to be engaged in a general conspiracy against law and order.     This question was somewhat considered by the Supreme Court of the United States. *Clawson* v. *United States*, 114 U. S., 477.     Congress had enacted a law which provided " that in any prosecution for bigamy, polygamy, or unlawful

cohabitation, under any statute of the United States, it shall be sufficient cause of challenge to any person drawn or summoned as a juryman or talesman, that he believes it right for a man to have more than one living or undivorced wife at the same time.'' This Act was held valid, and certain persons who were violators of the Act were excluded from the grand jury.

It is further objected that the trial Judge, in excluding the juror, acted upon the testimony of witnesses whose information was based merely upon rumor. The juror himself did not deny the rumor, and we think the Circuit Judge was fully warranted, from the silent acquiesence of the juror and the general rumor prevailing in the community, in holding him incompetent as a juror under the statute. Section 5822, Shannon's Code, provides ''that the Court shall inquire as to the existence of either or all of said causes of challenge (already enumerated) by the oath of the party or by such other testimony as the Court, in its discretion, may desire to hear on behalf of either party.'' Section 5818, Shannon's Code, also provides, viz.: ''The Court may discharge a grand or petit juror from service who does not possess the requisite qualifications, or who is exempt or disqualified from such service, or for any other reasonable or proper cause, to be judged of by the Court.''

We think the action of the trial Judge, in excluding the juror, was amply justified under either or all of the provisions cited.

In addition to all this, it appears from the record that the defendant obtained a satisfactory jury, without exhausting his challenges, and has, therefore, no ground to complain. 1 Lea, 41.

Affirmed.

Chief Justice Snodgrass concurs in the result, but is of opinion it is not necessary to pass upon Act of 1897, since the failure of defendant to exhaust his peremptory challenges is conclusive of the exception taken to action of the trial Judge, in dismissing the juror, Romines.